United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 11, 2006**

Charles R. Fulbruge III
Clerk

REVISED FEBRUARY 6, 2006
IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 04-11432

POSITIVE SOFTWARE SOLUTIONS, INC.,

Plaintiff-Appellee,

versus

NEW CENTURY MORTGAGE CORPORATION; NEW CENTURY
FINANCIAL CORPORATION; ECONDUIT CORPORATION; THE
ANYLOAN COMPANY; JEFF LEMIEUX; FRANK NESE,

Defendants-Appellants.

Appeal from the United States District Court for
the Northern District of Texas, Dallas

Before REAVLEY, GARZA, and BENAVIDES, Circuit Judges.

REAVLEY, Circuit Judge:

The question here is whether an arbitrator's failure to disclose that seven

years before the arbitration, he and his former law firm were co-counsel in a lengthy

litigation matter with one of the law firms and counsel in this matter, justifies

vacating the award. We hold that the arbitrator was required to disclose the

1

relationship because it might have created an impression of possible bias, and we affirm the district court's judgment vacating the arbitration award; but we vacate the portion of the district court's judgment that regulates a subsequent arbitration.

I.

A.

New Century Mortgage Corporation ("New Century") is in the mortgage business. It generates business through telephone contacts with prospective borrowers. Positive Software Solutions, Inc. ("Positive Software") develops, markets, and manufactures computer-software products for the mortgage industry. It developed "LoanForce," a software product that is a relational database for use in the mortgage lending business.[1] Positive Software licensed LoanForce to New Century pursuant to a Software Subscription Agreement ("SSA"). Positive Software learned that New Century was allegedly copying LoanForce and was incorporating it into different software products. Thereafter, Positive Software filed this lawsuit alleging, *inter alia*, claims of copyright infringement, theft of trade secrets, breach of contract, seeking specific performance, money damages, and preliminary and permanent injunctive relief. The district court granted Positive

---

[1] *Positive Software Solutions, Inc. v. New Century Mortgage Corp.*, 259 F. Supp. 2d 531, 533-34 (N.D. Tex. 2003) (discussing the inner workings of the LoanForce software).

2

Software's motion for a preliminary injunction enjoining New Century from using LoanForce.[2]  In addition, the district court compelled arbitration pursuant to the SSA.[3]

B.

Arbitration of this matter took place under the auspices of the American Arbitration Association ("AAA").  Pursuant to AAA procedures, the AAA provided the parties with a list of candidate arbitrators, along with their *curricula vitae*, and requested that the parties rank the candidates.  Both parties provided their lists of acceptable arbitrators to the AAA, ranking them in the order of preference as instructed.  Peter J. Shurn, III was one of the five arbitrator candidates listed.  The parties jointly selected Shurn to arbitrate this case as he received the highest combined ranking from the parties.[4]

The AAA contacted Shurn by letter to determine his availability.  That letter listed the names of the parties and counsel, including designating Susman Godfrey L.L.P. ("Susman Godfrey") as the firm representing New Century, and one if its

---

[2] *Id.* at 535-37.

[3] *Id.* at 538-40.  Positive Software appealed the district court's order on this issue and this court dismissed that appeal for lack of jurisdiction.  *Positive Software Solutions, Inc. v. New Century Mortgage Corp.*, 90 Fed. Appx. 728 (5th Cir. 2004).

[4] Positive Software objected to two of the five arbitrators on the AAA list and ranked Shurn first among the others.  New Century ranked Shurn third out of five.

3

partners, Ophelia F. Camiña, as New Century's arbitration counsel. At the bottom of the letter, there was an "important reminder" advising arbitrators of their "obligation to disclose any circumstance likely to affect impartiality or create an appearance of partiality." The same "important reminder" appeared in two subsequent letters addressed to Shurn.

Shurn signed and returned the standard "Notice of Appointment" form to the AAA, which advised arbitrators to "please disclose any past or present relationship with the parties, their counsel, or potential witnesses, direct or indirect, whether financial, professional, social or any other kind...." That letter included twelve questions to assist arbitrators in determining whether any "past or present relationship" required disclosure, including the following question, "Have you had any professional or social relationship with counsel for any party in this proceeding or with the firms for which they work?" Shurn indicated that he had nothing to disclose.

After a seven-day hearing, in a written ruling, Shurn found that New Century did not infringe Positive Software's copyrights, did not misappropriate Positive Software's trade secrets, did not breach the SSA, and did not defraud or conspire against Positive Software. Shurn ordered that Positive Software take nothing.

C.

4

Following the arbitration award, Positive Software conducted a detailed investigation into Shurn's background. It discovered that Shurn and his former law firm, Arnold White & Durkee ("Arnold White"), had been involved in a professional relationship with Susman Godfrey and Camiña, New Century's arbitration counsel, for a period of time.

Soon thereafter, Positive Software filed a motion to vacate the arbitration award. The district court granted Positive Software's motion on the ground that Shurn failed to disclose that he had "served as co-counsel with New Century's counsel over a period of years in significant litigation," and that this prior relationship "might create a reasonable impression of possible bias."[5] Further, Shurn's "failure to disclose that relationship deprived Positive Software of the opportunity to make an informed choice of arbitrators and requires vacatur of the award."[6]

The district court found that Intel and Cyrix were involved in "protracted patent litigation" for seven years, beginning in 1990 and ending in 1996.[7] Also, the district court found that Susman Godfrey and Arnold White represented Intel as co-

[5] *Positive Software Solutions, Inc. v. New Century Mortgage Corp.*, 337 F. Supp. 2d 862, 878 (N.D. Tex. 2004).

[6] *Id.*

[7] *Id.*

counsel from the beginning of the action, Camiña appeared for Intel early in the litigation, and Shurn began representing Intel in September 1992.[8] New Century claimed that Camiña's personal involvement in the case ended in July 1992, but the district court found that her name continued to appear with Shurn's name on pleadings as late as June 1993 and, further, a 1995 court opinion reflected that Susman Godfrey and Camiña, together with Arnold White, represented Intel.[9]

The district court further found that had Positive Software been aware of Shurn's prior relationship with Susman Godfrey and Camiña, it would not have ranked Shurn highly, and he would not have been chosen as the arbitrator.[10] The district court outlined the numerous reminders and opportunities that Shurn had to disclose his past professional relationship with Susman Godfrey and Camiña, and that he failed to do so.[11]

The district court held that any reasonable lawyer selecting a sole arbitrator for arbitration would have wanted to know that the arbitrator chosen had a prior association with opposing counsel, given the contentious nature of the dispute

[8] *Id.*

[9] *Id.*

[10] *Id.* at 879.

[11] *Id.* at 879-80.

6

between the parties and the duration and importance of the prior litigation with which both arbitrator and opposing counsel were associated.[12] Therefore, Shurn's failure to disclose his prior relationship with opposing counsel created a reasonable impression of possible partiality that warranted vacating the award.[13] The district court also held that Positive Software did not learn of Shurn's prior professional relationship until after the arbitration and, therefore, did not waive its objection to the nondisclosure.[14]

The district court also ordered that in the next arbitration, the parties must refrain from certain practices, including referring to any ruling of the first arbitrator and advising the new arbitrator of the first arbitrator's award.[15] After staying the second arbitration proceeding, this appeal followed.

## II.

We review a district court's decision to vacate an arbitration award under the same standard as any other district court decision.[16] We accept findings of fact that

---

[12] *Id.* at 885.

[13] *Id.*

[14] *Id.*

[15] *Id.* at 887.

[16] *Hughes Training Inc. v. Cook*, 254 F.3d 588, 592 (5th Cir. 2001).

are not clearly erroneous and decide questions of law de novo.[17] We also review

the application of law to fact de novo.[18]

## III.

## A.

Congress promulgated the United States Arbitration Act, 9 U.S.C. §§ 1-14, in

1925, to delineate the thorny relationship between the role of private arbitration and

the federal courts. Section 10 of the Act provides the grounds upon which a court

may vacate an arbitrator's award, and for our purposes, states that such a basis

exists "[w]here there was evident partiality ... in the arbitrator[]...."[19]

---

[17] *Id.*

[18] *Walker Int'l Holdings Ltd. v. Republic of Congo*, 395 F.3d 229, 233 (5th Cir. 2004). Relying on *Thornburg v. Gingles*, 478 U.S. 30, 78-79, 106 S. Ct. 2752, 2780-81, 92 L. Ed. 2d 25 (1986), wherein the Supreme Court held that the district court's ultimate finding of vote dilution, which "requires the application of a rule of law to a particular set of facts," is subject to the clearly erroneous standard of review because "[t]his determination is peculiarly dependent upon the facts of each case," Positive Software urges this court to review the application of law to fact for clear error because a nondisclosure claim is peculiarly dependent upon the facts of each case. We are unpersuaded and decline to apply the clearly erroneous standard of review to the application of the law to the facts. When this court has applied law to facts in cases concerning the Federal Arbitration Act, we have conducted de novo review. *See, e.g., Kergosien v. Ocean Energy, Inc.,* 390 F.3d 346, 352 (5th Cir. 2004); *Forsythe Int'l S.A. v. Gibbs Oil Co. of Texas*, 915 F.2d 1017, 1021 (5th Cir. 1990). In addition, other circuits that have considered nondisclosure in arbitration cases have applied de novo review when applying law to facts. *See, e.g., Olson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 51 F.3d 157, 160 (8th Cir. 1995); *Schmitz v. Zilveti*, 20 F.3d 1043, 1045 (9th Cir. 1994).

[19] 9 U.S.C. § 10(a)(2). 9 U.S.C. § 10 provides in full:

(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing,

8

Deciding what constitutes "evident partiality" in an arbitrator and the use of "undue means" has proved troublesome. The case law in this area is confusing and complicated. While this court has not previously determined the scope of this standard,[20] numerous courts in other jurisdictions, including the Supreme Court, have done so. We analyze those cases.

The case of *Commonwealth Coatings Corp. v. Continental Cas. Co.*,[21] involved an arbitration panel composed of two arbitrators chosen by each of the parties and a third "neutral" arbitrator who had previously worked for one of the parties to the arbitration. The neutral arbitrator voted with the panel for an award in

---

upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

(b) If an award is vacated and the time within which the agreement required the award to be made has not expired, the court may, in its discretion, direct a rehearing by the arbitrators.

(c) The United States district court for the district wherein an award was made that was issued pursuant to section 580 of title 5 may make an order vacating the award upon the application of a person, other than a party to the arbitration, who is adversely affected or aggrieved by the award, if the use of arbitration or the award is clearly inconsistent with the factors set forth in section 572 of title 5.

[20] The closest this court came to addressing the "evident partiality" standard was in *Bernstein Seawell & Kove v. Bosarge*, 813 F.2d 726 (5th Cir. 1987). There, this court stated in dicta that the "appearance of bias" is insufficient to warrant vacatur. *Id.* at 732. The standard for vacating an arbitration award for evident partiality has not been definitively addressed in this circuit.

[21] 393 U.S. 145, 146, 89 S. Ct. 337, 338, 21 L. Ed. 2d 301 (1968).

9

favor of the party with whom he had done business.[22] Thereafter, the party that lost the arbitration challenged the award, claiming that the failure of the arbitrator to disclose his significant business relationship resulted in "evident partiality" under 9 U.S.C. § 10, warranting vacatur of the award.[23]

Justice Black, in delivering the Court's opinion, concluded that the arbitrator's failure to disclose warranted vacating the award for evident partiality even though there was no evidence of actual bias.[24] The Court noted that arbitrators are not expected to sever ties with the business world, but nevertheless, it must be scrupulous in safeguarding the impartiality of arbitrators, as they have "completely free rein to decide the law as well as the facts and are not subject to appellate review."[25] As a result, the Court imposed "the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias."[26]

In a concurring opinion, Justice White, joined by Justice Marshall, specifically stated that he joined the Court's "majority opinion," and he emphasized

---

[22] *Id.*

[23] *Id.*

[24] *Id.* at 148-49, 89 S. Ct. at 339-40.

[25] *Id.* at 149, 89 S. Ct. at 339.

[26] *Id.*

that the parties must be cognizant of all non-trivial relationships in order to exercise

full and fair judgment.[27]  Justice White agreed on a rule of full disclosure:

> [I]t is far better that the relationship be disclosed at the outset, when the parties are free to reject the arbitrator or accept him with knowledge of the relationship and continuing faith in his objectivity, than to have the relationship come to light after the arbitration, when a suspicious or disgruntled party can seize on it as a pretext for invalidating the award.[28]

Although Justice White indicated that he was "glad to join" Justice Black's

opinion and that he desired to make "additional remarks," and Justice Black's

opinion was designated the "opinion of the court," some lower federal courts have

seen a conflict between the two writings.[29]  Accordingly, by treating Justice Black's

opinion as a plurality opinion, some courts have felt free to reject Justice Black's

---

[27]  *Id.* at 151, 89 S. Ct. at 340.

[28]  *Id.*

[29]  The opinion in *Commonwealth Coatings* is often referred to as a "plurality opinion."  *See, e.g., Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1358 n.19 (6th Cir. 1989); *Int'l Produce, Inc. v. A/S Rosshavet*, 638 F.2d 548, 551 (2d Cir. 1981).  In *Schmitz*, the Ninth Circuit explained why it believes the label is incorrect:

> Because three other justices dissented, the vote of either Justice White or Justice Marshall was necessary to the formation of a majority voting for reversal.  Justice White's concurrence has therefore been given particular weight. *Commonwealth Coatings* is not a plurality opinion, however.  Justice White said he joined in the "majority opinion" but wrote to make "additional remarks."

20 F.3d at 1045 (citation omitted).

We add that Justice White's concurring opinion is not irreconcilable with Justice Black's opinion.  Notably, Justice White never mentions the "appearance of bias" standard or suggests that it is inappropriate.  Rather than rejecting the "appearance of bias" standard, Justice White embraces it and attempts to more precisely define its parameters.  *See Commonwealth Coatings*, 393 U.S. at 151, 89 S. Ct. at 340 ("arbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, or if they are unaware of the facts but the relationship is trivial").  In fact, Justice White's concurring opinion complements the Court's opinion by encouraging "frankness at the outset." *Id.*  Thus, both opinions share the same goal—full disclosure at the outset.

statement that "evident partiality" is met by an "appearance of bias," and to apply a much narrower standard.

An early example of this occurred in *Morelite Constr. Corp. v. New York City District Council Carpenters Benefit Funds*.[30]  There, the court referred to Justice Black's opinion as a mere plurality of four justices and read much of that opinion as dicta.[31]  The court reasoned that something more than an "appearance of bias" was necessary to disqualify an arbitrator, but this was not a case of failure to disclose.[32]  Other federal circuits have adopted a similar "evident partiality" standard.[33]

Other federal circuits, centering on the need for full disclosure to parties who are choosing their own arbitrators, have adopted a much broader standard.  One such case is *Schmitz*, wherein the Ninth Circuit held that an arbitrator had a duty to

---

[30]  748 F.2d 79 (2d Cir. 1984).

[31]  *Id.* at 82-83.

[32]  *Id.* at 83-84.

[33]  *See Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 991 F.2d 141, 146 (4th Cir. 1993) (adopting the *Morelite* standard and holding that the arbitrator was unaware of the questioned relationship); *Apperson,* 879 F.2d at 1358 (adopting the *Morelite* standard and holding that the objection to the arbitrator had been waived); *Nationwide Mut. Ins. Co. v. Home Ins. Co.,* 429 F.3d 640 (6th Cir. 2005) (declining to deviate from *Apperson*); *Health Servs. Mgmt. Corp. v. Hughes*, 975 F.2d 1253, 1264 (7th Cir. 1992) (holding that the objection to the arbitrator was waived); *Ormsbee Dev. Co. v. Grace*, 668 F.2d 1140, 1147 (10th Cir. 1982) ("only clear evidence of impropriety [] justifies the denial of summary confirmation of an arbitration award....  For an award to be set aside, the evidence of bias or interest of an arbitrator must be direct, definite and capable of demonstration rather than remote, uncertain or speculative.") (internal citations omitted); *ANR Coal Co., Inc. v. Cogentrix of N. Am., Inc.*, 173 F.3d 493, 500 (4th Cir. 1999) (holding that mere nondisclosure does not itself justify vacatur).

disclose that his law firm had represented the parent company of a party to the arbitration.[34] After determining that Justice Black's opinion in *Commonwealth Coatings* was controlling precedent, the court stated that the "best expression" of the Supreme Court's holding is that evident partiality exists when "undisclosed facts show a reasonable impression of partiality."[35] The court discussed the important distinction between cases in which actual bias is alleged and those involving allegations of failure to disclose, observing that although the "reasonable impression of partiality" standard may not be appropriate in actual bias cases (though it has, confusingly, been used by some courts in those cases), it is the correct standard for nondisclosure cases:

> The policies of 9 U.S.C. § 10 ... support the notion that the standard for nondisclosure cases should differ from that used in actual bias cases. In a nondisclosure case, the integrity of the process by which arbitrators are chosen is at issue. Showing a "reasonable impression of partiality" is sufficient in a nondisclosure case because the policy of section 10(a)(2) instructs that the parties should choose their arbitrators intelligently. The parties can choose their arbitrators intelligently only when facts showing potential partiality are disclosed. Whether the arbitrators' decision itself is faulty is not necessarily relevant. But in an actual bias determination, the integrity of the arbitrators' decision is directly at issue. That a reasonable impression of partiality is present does not mean the arbitration was the product of impropriety.[36]

---

[34] 20 F.3d at 1049.

[35] *Id.* at 1046.

[36] *Id.* at 1047 (internal citation omitted).

13

Other courts have adopted a similarly broad standard of "evident partiality."[37]

B.

Having analyzed the case law, we address what standard to apply in this case. This is a nondisclosure case in which the parties chose the arbitrator.[38] Striking the balance of the competing goals of expertise and impartiality in the selection process, maintaining faithfulness to the Court's opinion in *Commonwealth Coatings,* and agreeing with the policy arguments set out in *Schmitz,* we hold that an arbitrator selected by the parties displays evident partiality by the very failure to disclose facts that might create a reasonable impression of the arbitrator's partiality. The evident partiality is demonstrated from the nondisclosure, regardless of whether actual bias

---

[37] *See Middlesex Mut. Ins. Co. v. Levine*, 675 F.2d 1197, 1200-01 (11th Cir. 1982) (adopting "reasonable impression of bias" standard); *Olson,* 51 F.3d at 159-60 (recognizing that disclosure of "even indirect ties" will aid the arbitration process); *see also Crow Constr. Co. v. Jeffrey M. Brown Assoc. Inc.,* 264 F. Supp. 2d 217, 222-23 (E.D. Pa. 2003) (noting the distinction between actual bias standard and appearance of bias standard, and adopting the latter).

State court are equally divided between the narrow view of *Morelite* and the broad view of *Schmitz. See Burlington N. R.R. Co. v. Tuco, Inc.*, 960 S.W.2d 629, 634-35 (Tex. 1997) (collecting cases); PHILIP L. BRUNER & PATRICK J. O'CONNOR, JR., 6 BRUNER AND O'CONNOR ON CONSTRUCTION LAW § 20:129 n.10 & n.14 (2005) (same).

[38] It has been suggested that the standards may differ depending on whether the parties have the ability to select the arbitrator, *Schmitz*, 20 F.3d at 1047-48 (stressing that arbitrators should be able to choose their arbitrators wisely and adopting a "reasonable impression of partiality" standard for arbitrators chosen by the parties), as opposed to when the parties have no say in the selection of the arbitrator, *Morelite*, 748 F.2d at 81 (collective bargaining agreement provided for designation of single neutral arbitrator without input from the parties); *Apperson* 879 F.2d at 1347 (same). Because the parties played no role in the selection of the arbitrator, *Morelite* and *Apperson* focused on whether the conflict was so severe as to indicate partiality or bias. *Morelite*, 784 F.2d at 84; *Apperson*, 879 F.2d at 1358-60. Whereas, because the parties selected the arbitrator, *Schmitz* focuses on whether the parties have access to all relevant information. *Schmitz*, 20 F.3d at 1047-48. In the instant case, we need not decide whether this matters.

14

is established.

Such a demanding disclosure rule ensures that the parties will be privy to a potential arbitrator's biases at the outset, when they are "free to reject the arbitrator or accept him with knowledge of the relationship and continuing faith in his objectivity," and allow the parties, who are "far better informed of the prevailing ethical standards and reputations within their business," to be the "architects of their own arbitration process."[39] A simple disclosure requirement minimizes the role of the courts in weighing arbitrators' potential conflicts,[40] and at the same time, minimizes the discretion of the arbitrators in determining what to reveal.[41] In addition, as the district court stated, "the full disclosure rule of *Commonwealth Coatings* reinforces the parties' expectations that arbitrators will abide by the Rule of the American Arbitration Association (and related rules), which the Supreme Court deemed 'highly significant.'"[42]

---

[39] *Commonwealth Coatings*, 393 U.S. at 151, 89 S. Ct. at 340 (White, J., concurring).

[40] *Sanko S.S. Co., Ltd. v. Cook Indus., Inc.,* 495 F.2d 1260, 1263-64 (2d Cir. 1973) (a demanding disclosure rule ensures that "the role of the judiciary in determining an arbitrator's impartiality after an award has been made will be significantly reduced").

[41] *Commonwealth Coatings*, 393 U.S. at 151, 89 S. Ct. at 340 (White, J., concurring) ("In many cases the arbitrator might believe the business relationship to be so insubstantial that to make a point of revealing it would suggest he is indeed easily swayed, and perhaps a partisan of that party. But if the law requires the disclosure, no such imputation can arise.").

[42] *Positive Software,* 337 F. Supp. 2d at 883 (quoting *Commonwealth Coatings*, 393 U.S. at 149, 89 S. Ct. at 339).

15

The standard we adopt comports with Canon II of the AAA's Code of Ethics for Arbitrators in Commercial Disputes ("Code of Ethics"),[43] which provides, in relevant part:

A.    Persons who are requested to serve as arbitrators should, before accepting, disclose:

\*      \*      \*

(2)    Any existing or past financial, business, professional, family or social relationships which are likely to affect impartiality or which might reasonably create any appearance of partiality or bias....

\*      \*      \*

B.    The obligation to disclose interests or relationships described in the preceding paragraph A is a continuing duty which requires a person who accepts appointment as an arbitrator to disclose, at any stage of the arbitration, any such interests or relationships which may arise, or which are recalled or discovered.

We note that we are not adopting an inflexible *per se* rule in nondisclosure cases. While an arbitrator to be selected by the parties need not disclose relationships that are trivial, an arbitrator should always err in favor of disclosure.

## C.

We now apply the standard we adopt to the facts of this case. Based on the facts of this case, New Century contends that no matter what standard this court

---

[43] We cite the Code of Ethics for discussion purposes only and are keenly aware that they are not binding on this Court, but are "highly significant." *Commonwealth Coatings*, 393 U.S. at 149, 89 S. Ct. at 339. In addition, we note the Code of Ethics was revised on March 1, 2004. Section (2) above now reads "any known existing or past financial, business, professional or personal relationships which might reasonably affect impartiality or lack of independence in the eyes of any of the parties. For example, prospective arbitrators should disclose any such relationships which they personally have with any party or its lawyer, with any co-arbitrator, or with any individual whom they have been told will be a witness...."

adopts, including the standard above, Positive Software cannot meet that standard. We disagree.

The district court found that Intel and Cyrix were involved in "protracted patent litigation" for seven years, beginning in 1990 and ending in 1996.[44] In addition, the district court noted that Susman Godfrey and Arnold White represented Intel as co-counsel from the beginning of the action, Camiña appeared for Intel early in the litigation, and Shurn began representing Intel in September 1992.[45] The district court discounted New Century's claim that Camiña's personal involvement in the cases ended in July 1992, because her name continued to appear with Shurn's name on pleadings as late as June 1993 (Shurn and Camiña's names appeared together on ten pleadings between September 1992 and June 1993) and a 1995 court opinion reflected that Susman Godfrey and Camiña, together with Arnold White, represented Intel.[46] We will not disturb these findings of fact.[47]

After reviewing the facts, we hold, like the district court did, that Shurn's past

---

[44] *Positive Software*, 337 F. Supp. 2d at 878.

[45] *Id.*

[46] *Id.*

[47] By relying on Camiña's affidavit, New Century downplays the relationship between Shurn and Camiña in the Intel litigation by pointing out that there were seven law firms and thirty-four different lawyers that represented Intel in the various stages of the lawsuit, that Shurn was involved in only one lawsuit in which Camiña and Susman Godfrey had worked, and that Shurn and Camiña had never met or spoke before the arbitration. The district court did not discuss these facts in its decision. Nevertheless, they do not change our analysis.

17

professional relationship with Susman Godfrey and Camiña might have conveyed an impression of possible partiality to a reasonable person. It is important to remember that the issue is only whether Shurn's prior professional relationship might reasonably give someone who is considering his services as an arbitrator the impression that he might favor one litigant over the other. It is not hard to think that Positive Software might not want to employ his services in an arbitration hearing with New Century once it discovered his prior relationship with the law firm and counsel representing New Century. On the other hand, Positive Software might decide that Shurn's qualifications as an arbitrator outweigh whatever concerns it might have. The point is simply that the information should have been disclosed to Positive Software so that it could make that decision. The integrity of the arbitral process demands no less.

New Century argues that a finding of evident partiality under the facts of this case would make the job of finding a qualified arbitrator burdensome and would disqualify most attorneys from large firms from acting as arbitrators. We disagree. Qualified arbitrators would not be disqualified from acting as arbitrators, rather, they would merely have to disclose their past relationships, and then it would be for the parties to decide whether, based on the disclosure, the arbitrator merits objection.

We conclude that the district court properly vacated the arbitration award by reason of Shurn's failure to reveal to the parties his prior professional relationship with Susman Godfrey and Camiña. We hasten to add that we do not imply that Shurn was guilty of any wrongdoing or that he was in fact biased or influenced by reason of the relationship. Nevertheless, as Justice Black emphasized in *Commonwealth Coatings*, such relationships must be disclosed to the parties if the integrity and effectiveness of the arbitration process is to be preserved.[48]

## III.

New Century maintains that Positive Software waived its nondisclosure objection by failing to raise the issue until after the arbitration award. The district court found that Positive Software was unaware of the undisclosed relationship until after the arbitration, and accordingly, held that Positive Software did not waive its objection to the nondisclosure.[49]

This court has not considered the issue of waiver of a nondisclosure objection. Our sister circuits require *actual knowledge* of an arbitrator's potential partiality on the part of the complaining party prior to the arbitration proceeding as

---

[48] 393 U.S. at 147-49, 89 S. Ct. at 339-40.

[49] *Positive Software*, 337 F. Supp. 2d at 885.

19

foundational to waiver.[50] We agree with our sister circuits and hold that one must have actual knowledge of the presence of a conflict of interest before one can waive the conflict. To hold otherwise, would turn the arbitration process on its head by shifting the onus from requiring an arbitrator to assume the duty of disclosure to requiring a party to assume a duty to investigate.[51]

Turning to the facts of this case, there is no evidence that Positive Software had actual knowledge of Shurn's past professional relationship with Susman Godfrey and Camiña. It is undisputed that Shurn never disclosed his past professional relationship with Susman Godfrey and Camiña. It was discovered through a post-award PACER[52] search. The uncontradicted affidavit testimony of two witnesses establishes that, if Positive Software had been aware of Shurn's previous professional relationship with Susman Godfrey and Camiña, it would have objected to him as the sole arbitrator. Based on these facts, we will not disturb the district court's finding that Positive Software did not learn of the professional

---

[50] *See, e.g., Apperson*, 879 F.2d at 1359 (affirming the district court's conclusion that, "as a general rule, a grievant must object to an arbitrator's partiality at the arbitration hearing before such an objection will be considered by the federal courts" but highlighting that "[t]he successful party ... may not rely on the failure to object for bias ... unless '[a]ll the facts now argued as to [the] alleged bias were known ... at the time the joint committee heard their grievances'"); *Middlesex*, 675 F.2d at 1204 ("Waiver applies only where a party has acted with full knowledge of the facts.").

[51] *Middlesex*, 675 F.2d at 1204.

[52] PACER, or the Public Access to Court Electronic Records System, is used by many federal courts to offer public access to docket information via the Internet.

20

relationship until after the arbitration, and therefore, did not waive its objection to the nondisclosure.

## IV.

In vacating the arbitration award, the district court ordered that in the second arbitration, the parties must refrain from certain practices, including referring to any ruling of the first arbitrator and advising the new arbitrator of the first arbitrator's award. New Century argues that the district court did not have the authority to dictate procedures for a second arbitration. We agree and hold that the district court erred in specifying procedures for the second arbitration.[53] Here, the district court lacked authority to go beyond vacating the award and dictating how the parties and the arbitrator should proceed in the second arbitration.

## V.

The district court's judgment vacating the arbitration award is modified to vacate the portion of the district court's judgment that regulates a subsequent arbitration and, as modified, is affirmed.

---

[53] *See Antwine v. Prudential Bache Sec., Inc.,* 899 F.2d 410, 413 (5th Cir. 1990) ("Judicial review of an arbitration award is extraordinarily narrow."); *Gulf Guar. Life Ins. Co. v. Connecticut Gen. Life Ins. Co.,* 304 F.3d 476, 487 (5th Cir. 2002) ("[C]hallenges to the procedural aspects of arbitration are for the arbitrator to decide, while challenges to the substantive arbitrability of disputes are for the courts to decide.").